

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

**FILED**

APR 18 2012

Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| 1.CAROLYN HOLMES ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | Case No:  **12 CV - 225 JHP   PJC** |
| ) | |
| 1.CANCER TREATMENT CENTERS) | |
| OF AMERICA, a/k/a ) | JURY TRIAL DEMANDED |
| SOUTHWEST REGIONAL ) | |
| MEDICAL CENTER ) | |
| Defendant | |

**PLAINTIFFS FIRST CAUSE OF ACTION,**

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

Comes now the Plaintiff, and for her first cause of action against the Defendant, and

alleges and states:

1. That at all times material hereto, the Plaintiff is a citizen and resident of the Northern

District of Oklahoma, and that the Defendant does business therein, and thus jurisdiction and

venue are present herein.

2. That at all times material hereto, Plaintiff was an employee, and the Defendant an

employer, as defined by the Americans With Disabilities Act.

3. That Plaintiff is a qualified individual with a disability, Post Polio Syndrome, and may

also be regarded as disabled by Defendant, due to symptoms and proposed medical diagnostic

procedures recommended by her physician for symptoms consistent with Multiple Sclerosis.

Plaintiff's Post Polio Syndrome interferes with one or more major life activities, as defined by

fees pd
51

the Americans with Disabilities Act, including walking, talking, sleeping, and working. It also interferes with the performance of one or more core duties of her job, however, with reasonable accommodations, Plaintiff has, for years, successfully performed her job, and was successfully performing her job at the time of her termination, and can continue to do so at present. As to Plaintiff's "regarded as disabled" claim, based upon Defendant's belief that Plaintiff suffers from MS, more will be said later in this Complaint.

4. Most recently, beginning in 2006, Plaintiff was an Oncology Information Specialist. The principal duties of that job consist of fielding calls from potential patients who are responding to Defendant's massive advertising efforts, nationwide. Defendant's advertising focused upon Defendant's representations that Defendant could successfully treat people with very serious Cancer, people who are in more serious physical condition, thus are more frightened by their condition, and looking for a high standard of treatment. Defendant promoted in their advertising that they were a highly successful treater of very serious Cancer sufferers. However, Plaintiff was informed that the Defendant sought only to accept individuals with substantial insurance coverage, and/or people of substantial means, and that Defendant wanted her to discourage and redirect potential patients who had Medicare, or were of limited means, to other, cheaper and less specialized facilities not associated with Defendant. This was a delicate and stressful job. Potential patients were promised hope in Defendant's advertising, yet Defendant wanted Plaintiff to "let those people down easy" and dash that hope for those who had Medicare, or were of more limited means.

5. In 2006, per her doctor's instructions, due to her Post Polio Syndrome, Plaintiff began to discuss working part time, to conserve her energy, and maintain greater focus. She went on a part time schedule in about September, 2006.

6. That during 2008, Plaintiff needed time off for surgery. In late 2009 or early 2010, Plaintiff began to experience Migraine headaches, which her doctor said might be related to MS. Plaintiff so informed Defendant.

7. While Plaintiff was working on a part-time schedule in 2010, Defendant re-routed calls from Plaintiff. Thus, Plaintiff's number of calls dropped precipitously, causing Plaintiff to drop below established performance standards. Plaintiff pointed out that she did not control the volume of calls routed to her, but to no avail, and Plaintiff received a Performance Improvement Plan.

8. Plaintiff sought  assistance in getting her numbers back up, but was told that the only way she could get more calls was to go back on full time. In January, 2011, solely to save her job, Plaintiff went back on full time. But, in April, Plaintiff simply couldn't take the workload and hours, and went back to part time. Therefore, she was "counseled" for missing 8 days in 5 months. Each of these absences had been discussed before they were taken, and each was related to her physical condition described above, and she was cleared in advance to take each one. But she was still given a "counseling".

9. In about May, 2011, Plaintiff returned to part time in the evening, due to her condition. Therefore, Plaintiff requested Intermittent Leave, as described in the Family and Medical Leave Act. At the time of her request for FMLA, Plaintiff had met the requisite number of hours worked in the previous 12 months. A member of the Human Resources staff said he "had no problem" with her request for Intermittent Leave. However, from that moment on, including to the present, Defendant took no steps to provide Plaintiff with the paperwork outlined in the FMLA and regulations to complete an application or to have information provided by her health care provider. Every time Plaintiff questioned her FML:A status, she was "stonewalled", and nothing was ever done by Defendant.

10. On July 11 and 12, 2011, Plaintiff was hospitalized. In the course of her treatment, her doctor ordered a brain scan/MRI, for July 14, 2011 for lesions on her brain, which he stated could be indicators of MS. Plaintiff so notified Defendant.

11. On July 13, 2011, Plaintiff was out of the hospital. On that day, Defendant directed Plaintiff to "come in early", on July 14, 2011, before her MRI scheduled that day. On July 14, 2011, Plaintiff came in to work, thinking that Defendant intended to make her feel better about her health, and upcoming MRI, but, instead, Defendant fired her. Hours before her MRI for possible MS. So, Plaintiff has not been financially able to have the MRI since she has no insurance, thanks to her termination. Plaintiff has reason to believe that Defendant believed Plaintiff has MS, which would further impact her work performance, and chose to terminate her rather than take that chance.

12. Defendant thus violated the Americans With Disabilities Act by terminating Plaintiff rather than continuing to make reasonable accommodations for Plaintiff, inter alia by   allowing her flexibility in her work schedule, as had been done in the past, and/or adjustment of her performance requirements to fit reduced hours and call volume, and/or intermittent leave under the FMLA Defendant also regarded Plaintiff as having MS, and terminated her, in whole or in part therefor.

13.  Plaintiff has thus been discriminated against under the Americans With Disabilities Act, giving rise to a cause of action thereunder, for damages in an amount in excess of $75,000, for which Plaintiff now prays.

14. That the acts of the Defendant were wilful, wanton and malicious, giving Plaintiff a claim for punitive damages in an amount in excess of $75,000, for which Plaintiff further prays.

WHEREFORE Plaintiff prays for damages in an amount in excess of $75,000 actual, and in an amount in excess of $75,000 punitive, costs of this action including a reasonable attorney's fee, and for all other relief at law or in equity.

## PLAINTIFF'S SECOND CAUSE OF ACTION,
## VIOLATION OF THE FAMILY  MEDICAL LEAVE ACT

Comes now the Plaintiff, and for her Second Cause of Action, and re-adopts and re-alleges each and every allegation set out above, and further alleges and states:

15. As alleged in her First Cause of Action, Plaintiff began requesting Intermittent Leave for her condition, in May, 2011. Defendant failed to take the requisite statutory and regulatory steps of providing Plaintiff with the necessary forms to make application for FMLA, and failed to execute and deliver the necessary forms mandated by the FMLA to solicit medical information from Plaintiff's health care providers. Additionally, Defendant failed to enter into the interactive process envisioned by the FMLA and regulations, designed to protect Plaintiff's employment rights under the FMLA, electing instead to terminate her..

16. The Defendant thus terminated the Plaintiff in violation of the FMLA, giving Plaintiff a claim thereunder for actual damages in an amount in excess of $75,000, for which Plaintiff now prays.

17. That the acts or omissions of the Defendant were wilful, wanton and malicious, giving Plaintiff a claim for punitive damages in an amount of $75,000, for which Plaintiff now prays.

WHEREFORE, Plaintiff prays for damages in an amount in excess of $75,00 actual, and in excess of $75,000 punitive, costs of this action including a reasonable attorney's fee, and all other relief appropriate at law or in equity.

Respectfully submitted,

S/Jeff Nix
Jeff Nix
OBA 6688
406 So. Boulder, Ste 400
Tulsa, OK 74103
(918) 587 3193
Fax (918) 582 6106