**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

CAROLYN HOMES,            )
                                 )
          Plaintiff,          )
                                 )     Case No. 12-CV-225-JED-PJC
v.                          )
                                 )
SOUTHWESTERN REGIONAL     )
MEDICAL CENTER, INC.,        )
                                 )
          Defendant.      )

## OPINION AND ORDER

**I.     Background**

*Employment with SRMC*

The following facts, supported by record evidence, are drawn in favor of the plaintiff. Plaintiff, Carolyn Holmes, was employed as an Oncology Information Specialist (OIS) representative for the Cancer Treatment Centers of America, also known as the Southwest Regional Medical Center, Inc. (SRMC) until July 14, 2011, when her employment was terminated. Holmes had worked for SRMC since February 26, 2002 and was promoted to the position of OIS representative on May 11, 2004. OIS representatives are responsible for communicating with potential cancer patients and family members and providing them with information about SRMC. As an OIS representative, Holmes was assigned a "sales quota" for each month, that is, a set number of patients who would ultimately select and receive cancer treatment with SRMC in any given month based upon contacts with the OIS representative. Holmes generally acknowledges that OIS representatives were expected to meet 80% or more of their quotas, but disputes that there was any policy or rule requiring discipline or termination for a failure to meet those expectations.

SRMC terminated Holmes's employment on July 14, 2011, allegedly based upon Holmes's failure to meet 80% of her sales quota. Holmes brings employment claims against SRMC, claiming that her employment was terminated because of complications from her post-polio syndrome, in violation of the Americans with Disabilities Act (ADA), and in violation of the Family and Medical Leave Act (FMLA). SRMC seeks summary judgment on all of Holmes's claims.

*Resignation, Severance Terms, and General Release*

Holmes asserts that two letters, a two page letter titled "Re: <u>Resignation, Severance Terms and General Release</u>" and a letter of resignation were presented to her together, for her signature at the time she was notified her employment was being terminated. Although the two page letter purports to "outline[ ] and memorialize[ ] [the parties'] mutually-agreed plans for a termination [of Holmes's employment]," it is undisputed that Holmes had no prior knowledge of the document or such plans until it was presented to her. The two page letter also stated that Holmes had 21 days to consider it, but expressly required that Holmes sign and tender the attached resignation letter prepared for her by SRMC *that day*, July 14, 2011. She signed both letters at the July 14, 2011 meeting at which she was first informed of her termination. On its face, the two page letter provided Holmes seven days to revoke or rescind it.

On July 18, 2011 – four days after the termination meeting – Holmes informed SRMC that she was rescinding the letter of resignation she signed on July 14, 2011. SRMC thereafter wrote to Holmes in a letter dated July 21. In the letter, SRMC indicated that Holmes's intentions were "unclear," and SRMC stated that, if Holmes intended that SRMC alter her employment file to reflect that she did not voluntarily resign, then SRMC would do that and indicate that she was terminated effective July 14, 2011. On the other hand, if it was her intent to revoke acceptance

of the 2 page letter, then SRMC would "not issue the Final Paycheck to [Holmes], which would have consisted of wages and benefits to which you were not otherwise entitled [and] your benefits will cease at the end of the month, July 31, 2011."  SRMC also informed Holmes that "[a]ny accrued, unused vacation hours would have been processed and paid in the next payroll cycle on August 5, 2011, but we have discovered that you received an overpayment of unearned wages in the amount of $1,899.07" and that Holmes would "be indebted to the organization in the net amount of $1,899.07...."  SRMC further indicated that it would grant Holmes another five business days – until July 29, 2011 – to deliver a written notice clarifying her intent to revoke, and stating "[i]f I do not hear from you by 5:00 pm on Friday, July 29, 2011, I will conclude you have no intention of revoking your acceptance of the severance agreement."

Thereafter, Holmes re-signed the same letter she had previously sent and dated it July 25, 2011.  On August 2, 2011, SRMC sent another letter to Holmes, stating that, because Holmes "did not expressly revoke [her] acceptance of the severance agreement..., the severance agreement is now fully effective and enforceable" and informing Holmes that she would receive a check for $949.54, representing two weeks of severance pay, and on August 19, 2011, Holmes would receive a check for $474.77, representing one week of severance pay.   Holmes then delivered a letter to SRMC on August 4, 201, which stated:

> I have received your letter of August 2, 2011.  It was my understanding and belief that my resignation and severance agreement were linked; that there could be no settlement without my resignation.   The settlement agreement specifically required that I resign.  Therefore, my revocation of my resignation also revoked my settlement agreement.

> I have revoked my resignation and the settlement agreement.  Therefore, do not send me any severance pay or other benefits associated with the settlement agreement.

(Doc. 96-30).  SRMC argues that the first two letters sent by plaintiff were effective only to the extent they revoked the resignation letter, and were not effective to revoke the release on the 2 page letter she signed.  In addition, SRMC asserts that the August 4, 2011 letter was too late to constitute a proper revocation of the release contained in the two page letter.

*Reasons for Termination*

Holmes claims that her employment was terminated because of the complications she suffered as a result of post-polio syndrome and because SRMC wanted to fire her before she took FMLA leave.  SRMC denies those claims and alleges that it terminated Holmes's employment solely based upon Holmes's failure to meet 80% of her quota on a year-to-date (YTD) basis, as measured each quarter.  Holmes asserts that the evidence supports a finding that SRMC's stated reason was pretextual.  Specifically, she asserts that the quota criteria were somewhat arbitrarily assigned by Holmes's supervisor, Annabelle Falconetti.  For example, Holmes notes that Falconetti set a zero quota in each of the first several months of a calendar year for one employee and then changed it to a quota of two, then four, then six for the last month of the year.  (Doc. 96-5 at 2).  When that OIS employee had patients treated in those zero quota months, the employee exceeded 100% of quota in those months and thus had an artificially high quota YTD percentage later in the year when the employee had any number of patients treated at SRMC during those months. (*See id.*).  Falconetti also changed quota numbers for at least one other employee to zero for three months, with the same effect.  (*See id.*).

Holmes also cites evidence that she did improve and continued to show improvement up until she was terminated.  For instance, Holmes notes that, for three quarters in a row, she was placed on a Performance Improvement Plan (PIP), although her performance was improving and she met quarterly quotas in two of those quarters.  Holmes was placed on the first PIP after her

4

quota for the first fiscal quarter of 2011 (covering the months of July, August, and September 2010) was 70.83%, short of the 80% expected. The first PIP stated that she "must demonstrate immediate and sustainable improvement" in several areas. Included among the "Objectives" listed on the first PIP was that she should "Attain Monthly Treatment Quota for 1st Shift OIS Representative," for "October, November, and December," which was "8 Treated Patients per month." For those months of October, November, and December 2010, which was the second fiscal quarter of 2011, Holmes had an 81.82% quarterly quota percentage.

Although Holmes met her 80% quarterly quota for that second fiscal quarter and the first PIP said nothing about YTD quotas, SRMC placed Holmes on a second PIP, stating that "[y]our performance in the second quarter, October, November, and December improved at 81.82%, but because your YTD is under 80% at 76.09% it triggered this second written [PIP]." Like the first, the second PIP also directed Holmes that she "must demonstrate immediate and sustainable improvement" and listed an "Objective" that she should "Attain Monthly Treatment Quota of 8 Treated Patients per month."

For the third fiscal quarter, January, February, and March 2011, Holmes's quota percentage dropped to 75% and she was placed on a third PIP, which stated in part, "For the next 90 days, from April 1, 2011 to June 30, 2011 your work will continue to be closely monitored by your leadership team and continued improvement must be demonstrated." Holmes was directed that she must demonstrate immediate and sustainable improvement in attaining the monthly treatment quota in April, May, and June 2011.

For April, May, and June, 2011, Holmes's quota percentage was 88.8%. Despite the improvement in her quarterly performance, SRMC terminated her employment, based upon the stated reason that she had not met her YTD quota of 80%. As noted, Holmes met her quarterly

quotas for two of the three quarters following the initial PIP, and her YTD percentage also showed improvement over the course of those three quarters, improving from 70.83% to 78.4%. Holmes notes the foregoing quota percentages, in the context of the actual language of the PIPs, as evidence that the stated reason for her termination was pretextual.

Holmes cites other documentary evidence in further support of her argument that she was terminated as a result of her disability. For example, Holmes asserts that it may be inferred from the following email that SRMC was attempting to build a case for termination based on a pretext and that SRMC employees were thus "weighing the risks of termination" and attempting to prevent plaintiff from asserting her rights under the FMLA:

**From:** Foley, DeAnne
**Sent:** Thursday, April 14, 2011 11:03 PM
**To:** Falconetti, Annabelle
**Subject:** Hold off on discussing FMLA with Carolyn!!!!

Annabelle, I spoke with Wendy at length about our situation with Annabelle. She'd like to explore & weigh our risks with the various options we are faced with in this situation. Please gather her attendance record, and let's discuss that first, before we have further discussions about the FMLA. We certainly need to be consistently applying the OIS policies fairly across the board, so need to also weigh the risks of termination due to quotas not being met, and perhaps handle that separately from the attendance. I'll be out tomorrow in a training session with Denise, but will be back in next week. Can you set up some time for us to review her attendance record on Monday?

Thanks,

*DeAnne Foley, PHR, CHCR*
Talent Management Partner
Cancer Treatment Centers of America

Doc. 96-2 (highlighting added). Annabelle Falconetti, the OIS supervisor, responded in part "Thanks for the heads up!" (*Id.*).

In another internal SRMC document dated July 9, 2011, Wendy Whelan provided Jay Foley and Annabelle Falconetti with a "chronologic list of [Holmes's] performance, dating back to 2007" and asked Foley and Falconetti for their "final decision" on whether to terminate Holmes's employment. In that short "chronologic list of performance" issues, for the date of April 27, 2011, Whelan indicated that there was a discussion about Holmes's unscheduled

absences and that Holmes "asked about 'disability' of which Annabelle referred her to Taron McKowen in Talent to discuss disability." The chronology also indicates that, in May, 2011, Holmes "voiced concern about returning to full time status, which was scheduled for September 2011, due to the new Embrace Model." The chronology ends noting that in July 2011, Holmes's "YTD % remains below 80% (78.4%)," without mentioning the language of the PIPs, the improvement made by Holmes, or the fact that her fourth quarter quota percentage was 88.8%.

On July 11, 2011, three days before Holmes's employment was terminated, Annabelle Falconetti and Jay Foley exchanged emails regarding the fact that Holmes was admitted to the hospital and would be there at least for the night. Jay Foley responded that Taron McKowen confirmed that Holmes had not turned in FMLA paperwork to SRMC's third-party administrator. Holmes testified that she was waiting on information from Taron McKowen regarding the filing of FMLA paperwork, because he had to confirm whether she had sufficient hours which would impact her leave. Holmes indicated that she followed up with McKowen and others, but they were unresponsive despite her numerous follow-up attempts.

When Holmes was called to a meeting on July 14, 2011, she believed that the meeting was going to be about her inquiries regarding FMLA leave. Instead, she was presented with the termination documents and informed that she was being terminated, but that she could choose to characterize it as a voluntary resignation. Plaintiff testified that, as soon as she was notified that she was being terminated, she broke down "sobbing" and "crying," looked at the documents presented to her, saw where they were asking her to sign, and affixed her signature to the two letters, which were presented together for her signature.

## II.       Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "By its terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

The same standard applies at the summary judgment stage where qualified immunity is raised. *See Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam). Thus, the court may not weigh the evidence and must resolve genuine disputes of material fact in favor of the nonmoving party. Thus, the district court may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant, and must draw reasonable inferences in favor of the non-movant. *Id.* at 1868.

## III.    Discussion

### A.    Separation Documents and Revocation

SRMC contends that Holmes waived her rights to bring ADA and FMLA claims, by virtue of the two page separation letter she signed at the time of her termination on July 14, 2011. SRMC also argues that she did not present a timely, proper notice of revocation and that the release contained in the document is thus enforceable to bar Holmes's claims.

The Court finds that the evidence summarized above precludes summary judgment, because a reasonable jury could find from the facts that Holmes intended to revoke the separation documents when she notified SRMC that she was revoking her resignation letter, which she believed was a part and condition precedent of the separation letter. While SRMC characterizes the document containing the release as the "Severance Agreement," the document is a two page letter styled "Re: Resignation, Severance Terms and General Release," and it was presented to Holmes with the resignation letter attached. The document required that Holmes sign the resignation letter that day and she has presented evidence that she understood that the resignation and severance were "linked" and "there could be no settlement without my resignation." Holmes asserts that the resignation letter was a condition precedent to the effectiveness of the settlement agreement such that her revocation letter sent four days later was intended to and did revoke the entire agreement. Construing the evidence in favor of Holmes, the record evidence supports that assertion.

SRMC has cited one unpublished decision of the Tenth Circuit in support of its argument that Holmes did not timely revoke the agreement. That case is distinguishable on its facts. There, the employee voluntarily resigned after being informed that her compensation was being modified. *Aduddell v. Gardner Tanenbaum Group*, 425 Fed. Appx. 698, 700 (10th Cir. 2011).

Two days after she resigned, she e-mailed a resignation letter.  One week after the receipt of the resignation letter, the employer's counsel sent an "Agreement and General Release" to the employee for review, and the employer subsequently modified the agreement at the request of the employee, then resent it to her for further review.  The employee ultimately signed the final version of the agreement nine days after she resigned.  Ten days after the employee and the employer signed the agreement, the employee asked the employer's counsel when she would receive her severance check.  She picked up her severance check the following day.  Two days after she received the severance check, which was fourteen days after signing the Agreement and General Release, the employee notified the employer that she was invoking her right to revoke. *Id.*

In contrast to the facts in *Aduddell*, Holmes did not voluntarily resign, but was notified that her employment was terminated but that she could have it deemed a resignation if she wished.  She was presented the letter styled "Re: Resignation, Severance Terms and General Release," with the letter of resignation attached.  Although the letter of resignation was on letterhead with Holmes's name, SRMC prepared that letter.  The two page letter expressly required that Holmes sign and tender the attached resignation letter that day, July 14, 2011.  She signed both letters at the July 14, 2011 meeting at which she was first informed of her termination.  These facts are unlike the facts in *Aduddell*, where the resignation letter predated and was completely separate from the separation agreement and general release.  Also, unlike the employee in *Aduddell*, Holmes sent a letter to SRMC before the expiration of the revocation period, indicating that she wished to revoke her resignation and, before receiving any severance pay, Holmes unquestionably notified SRMC that she believed she had revoked her resignation and the settlement agreement and instructed SRMC *not* to send any severance pay.  These

distinctions are material, and the Court concludes that the evidence construed in Holmes's favor presents an issue of fact as to whether Holmes properly and timely revoked the release contained in the two page letter she was presented.

### B.     ADA Discrimination Claim

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the absence of direct evidence of discrimination, ADA discrimination cases are subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). The plaintiff bears the initial burden of establishing a prima facie case of discrimination under the ADA. To establish a prima facie case of discrimination under the ADA, Holmes must demonstrate that (1) she is "disabled" within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, with or without reasonable accommodation, and 3) she was discriminated against because of her disability. *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1261 (10th Cir. 2009); *Butler v. City of Prairie Vill.*, 172 F.3d 736, 748 (10th Cir. 1999).

At the prima facie stage, there must be evidence that Holmes was terminated because of her disability, which "requires [that Holmes] present some affirmative evidence that disability was a determining factor in the employer's decision." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted). "The plaintiff's burden at the prima facie stage requires only a 'small amount of proof necessary to create an inference' of discrimination ... by a 'preponderance of the evidence,'" and that burden is not onerous. *Smothers v. Solvay Chem.*,

Inc., 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) and *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000)).

If the plaintiff meets her prima facie burden, then the defendant must offer a legitimate, non-discriminatory reason for the employment action. If the defendant satisfies its burden, the plaintiff then has the burden of demonstrating that the defendant's proffered reason is pretextual. *McDonnell Douglas*, 411 U.S. at 802-03; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). To defeat summary judgment, the plaintiff has to show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). An employee's "[m]ere conjecture that the employer's reason is pretext ... will not defeat a motion for summary judgment." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).

### 1.    Disability

At the summary judgment stage, SRMC "does not dispute [that Holmes] is disabled within the meaning of the ADA and ADA Amendments Act of 2008 as a result of her post-polio syndrome." (Doc. 87 at 29, fn.8). Accordingly, the first element of Holmes's ADA discrimination claim is satisfied.

### 2.    Qualified to Perform the Essential Functions of the Job

SRMC argues that Holmes cannot establish that she was qualified, because the Social Security Administration (SSA) determined her to be disabled retroactive to July 14, 2011, the date of the termination of her employment at SRMC, and awarded Social Security Disability Insurance (SSDI) benefits as of that date. In addition, SRMC notes that, in response to a form

question, "Have you ever been fired or laid off from a job because of problems getting along with people," Holmes responded that she "was terminated as not meeting productivity standards" and "for not being able to do the job anymore." (Doc. 87-17 at 10; Doc. 87-18 at 8). According to SRMC, these representations establish that Holmes was not qualified to perform her job at SRMC.

In response, Holmes notes that she testified two years after the termination of her employment at SRMC that she still could perform her job duties, on a part-time basis. Holmes also argues that her statements on the SSA forms were not complete and were merely reporting SRMC's stated reasons for the termination, rather than her own belief that she could not perform her job or meet productivity standards. Finally, Holmes contends that, pursuant to the holding of *Cleveland v. Policy Mgmt. Syst. Corp.*, 526 U.S. 795 (1999), SRMC is not entitled to summary judgment merely because of her representations or the SSA's determination of her disability.

In *Cleveland*, a unanimous Supreme Court held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA." 526 U.S. at 797-98. The Court found that there are "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 803. In arriving at that conclusion, the Court noted that the ADA defines a "qualified individual" as a disabled person who can perform the essential functions of her job "with ... reasonable accommodation," which may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." *Id.* (quoting 42 U.S.C. § 12111(8), (9)(B)). In contrast, "when the SSA

determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." *Id.* Additionally, the Court in *Cleveland* concluded that, as a result of the five-step process used to aid the SSA in making the SSDI determination, "an individual might qualify for SSDI under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'perform[ing] the essential functions' of her job." *Id.* at 804. As a result of these and other examples, the Court held that it "would not apply a special legal presumption permitting someone who has applied for, or received, SSDI benefits to bring an ADA suit only in 'some limited and highly unusual set of circumstances.'" *Id.* at 805.

While the Court in *Cleveland* rejected the application of a presumption, it recognized that there may be "some cases [where] an earlier SSDI claim may turn out genuinely to conflict with an ADA claim." *Id.* Thus, a "plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case – at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation." *Id.* at 806. "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.* at 807.

Applying the standards set forth in *Cleveland*, the Court concludes that the evidence, construed in favor of Holmes, is sufficient to demonstrate that, as of July 14, 2011 when her

employment was terminated, Holmes was qualified to perform the essential functions of her job as an OIS representative, with reasonable accommodation. Holmes has provided a sufficient explanation for the statements in her applications for SSDI benefits. She believed that she could work part time. The statements she made were on forms that provided only a few lines for explanation and no room for elaboration, such that she did not have an opportunity to explain that she could perform with accommodation. As the Supreme Court in *Cleveland* noted, the SSDI determination of disability does not require consideration of potential accommodation. *See* 526 U.S. at 803. Moreover, it is undisputed that, at the time her employment was terminated, her quarterly percentage of quota was 88.8%, more than eight percent *above* the expected quarterly requirement. Thus, the most recent performance data available at the date of her termination was that she had exceeded the 80% quarterly requirement. This is certainly some evidence that she could perform the essential functions of her job, with or without reasonable accommodation.

### 3.     Discrimination Based upon Disability

SRMC argues that Holmes has not provided evidence that the termination of her employment was the result of discriminatory intent. As noted, at the prima facie stage, Holmes must "present some affirmative evidence that disability was a determining factor in the employer's decision," which is not an onerous burden. *Morgan*, 108 F.3d at 1323. The Court concludes that the evidence, construed in favor of Holmes, is sufficient to establish a prima facie case of discrimination based upon disability. There is evidence that the "patients treated" numbers that were used to determine quotas were not the same for all employees. At least one other employee was assigned a zero quota such that the employee was not required to have any patients treated in those zero quota months to make 100% of quota.

Although plaintiff was terminated on July 14, 2011, there is evidence that SRMC considered termination months earlier. In an email, SRMC employees discussed delaying a conversation with Holmes about taking FMLA leave and noted that "[w]e certainly need to be consistently applying the OIS policies fairly across the board, so need to also weigh the risks of termination due to quotas not being met...." The memorandum prepared by SRMC's Whelan just five days before plaintiff was terminated expressly included in a "chronologic list of performance issues" that Holmes had "asked about 'disability' of which Annabelle referred her to Taron McKowen in Talent to discuss disability." The chronology also indicates that, in May, 2011, Holmes "voiced concern about returning to full time status, which was scheduled for September 2011, due to the new Embrace Model." Just three days before Holmes's employment was terminated, SRMC employees discussed the fact that Holmes had been admitted to the hospital and would be there at least for the night, and they wanted to confirm that Holmes had not yet completed FMLA paperwork with the third-party administrator. A reasonable juror could infer from this evidence that SRMC was attempting to build a case for termination based on a pretext, was concerned about terminating Holmes at that time in light of the "need to be consistently applying the OIS policies fairly across the board," and was "weighing the risks of termination" and attempting to delay discussions about FMLA with Holmes until SRMC established its plan. Accordingly, Holmes has presented enough evidence to establish a prima facie case for ADA discrimination.

### 4. Legitimate Non-Discriminatory Reason and Pretext

SRMC asserts that it discharged Holmes "because she repeatedly failed to satisfy the mandatory sales quotas," which is a legitimate, non-discriminatory reason. (Doc. 87 at 31). Holmes contends that the stated reason was pretextual. To avoid summary judgment, Holmes

must offer evidence that SRMC's reason is a pretext for discrimination.  *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1260 (10th Cir. 2001).  To demonstrate pretext, the plaintiff may show "either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."  *Smothers*, 740 F.3d at 539 (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007)).  If "a plaintiff demonstrates that an employer's proffered reasons are 'unworthy of credence,' a jury may 'infer the ultimate fact of discrimination' or retaliation."  *Id.* at 546 (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

The evidence construed in favor of Holmes presents a genuine dispute of material fact as to whether SRMC's proffered reason was pretextual.  The first PIP notified Holmes that she must show improvement and she did show improvement up to the date of her termination.  The first PIP did not even mention YTD quotas at all, and instead instructed Holmes that she "must demonstrate immediate and sustainable improvement" and should "Attain Monthly Treatment Quota for 1st Shift OIS Representative," for "October, November, and December."  For the quarter covering those months of October, November and December, Holmes did improve and she exceeded the 80% quota percentage, but she was placed on a second PIP nonetheless. The third PIP stated in part that, "from April 1, 2011 to June 30, 2011 your work will continue to be closely monitored by your leadership team and continued improvement must be demonstrated." Holmes' quota percentage for those months did, in fact, improve, and her quota percentage was at 88.8%.  Despite that improvement, SRMC terminated her employment, based upon the stated reason that she had not met her YTD quota of 80%.  In short, Holmes met her quarterly quotas for two of the three quarters following the initial PIP, and her YTD percentage also showed

significant improvement over the course of those three quarters, improving from 70.83% to 78.4%.

Moreover, the internal SRMC communications in April and July, 2011 offer some additional support for Holmes's assertion of pretext. As previously explained, the e-mail exchange between DeAnne Foley and Annabelle Falconetti supports an inference that SRMC was building a case to terminate Holmes on a pretext of insufficient quota performance. Whelan's July 2011 chronology of performance issues referenced the fact that plaintiff had inquired about "disability" leave. That chronology also relied upon the fact that Holmes's "YTD % remains below 80% (78.4%)," but failed to even mention the language of the prior PIPs, which required improvement, or the fact that Holmes's fourth quarter quota percentage, immediately before termination, was 88.8%. Holmes was terminated just days after a hospital stay, during which SRMC employees were conferring as to whether Holmes had yet initiated FMLA leave paperwork with the third-party administrator. That evidence could certainly support an inference that SRMC wished to terminate Holmes before she did so or otherwise because of her disability.

In its reply briefing, SRMC asserts that the April 2011 e-mail from DeAnne Foley to Annabelle Falconetti cannot be considered to show a discriminatory intent because DeAnne Foley was not a decision maker with respect to the termination of Holmes's employment. (Doc. 102 at 4-5). In addition, SRMC offers a different construction of the e-mail than Holmes presents, and SRMC asserts that it was not trying to prevent Holmes from seeking FMLA leave. (*See id.*). This factual dispute as to the meaning of the e-mail is for a jury to determine, because Holmes has offered a reasonable construction of the e-mail which, construed in her favor, is consistent with the face of the e-mail and generally supports her assertion of discriminatory

intent.  Moreover, SRMC's arguments in its reply briefing are dependent upon an affidavit provided by DeAnne Foley, which was presented for the first time in reply and to which Holmes thus had no opportunity to respond.[1]  In any event, the Court notes that, regardless of whether or not DeAnne Foley was involved in SRMC's decision to terminate Holmes's employment in July 2011, Falconetti, the OIS supervisor, was the recipient of that e-mail, and Whelan's July 2011 memorandum regarding termination indicates that Falconetti and Tom Foley were the SRMC employees who would be involved in the "final decision" to discharge Holmes.  Also, while SRMC attempts to characterize the April e-mail as having nothing to do with Holmes's subsequent termination, that e-mail on its face expressly refers to "weigh[ing] the risks of termination ..." in the same context as references to FMLA options and absences from work. SRMC's proffered interpretation of that e-mail is certainly not "so one-sided that [SRMC] must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  Rather, the face of the document and the context surrounding it can be reasonably interpreted to support Holmes's construction.

In short, there is enough evidence from which a reasonable jury could infer a discriminatory intent.  SRMC's request for summary judgment on the ADA discrimination claim is thus denied.

---

[1]     Normally, the Court does not consider arguments or evidence first raised in reply.  *See Cahill v. American Family Mut. Ins. Co.*, 610 F.3d 1235, 1239 (10th Cir. 2010) (citing *Hill v. Kemp*, 478 F.3d 1236, 1250–51 (10th Cir. 2007)) (arguments first raised in a reply brief come too late); *Ulibarri v. City & County of Denver*, 742 F. Supp. 2d 1192, 1218 (D. Colo. 2010) (argument first raised in reply brief may be disregarded); *Lobato v. New Mexico Environ. Dept.*, 838 F. Supp. 2d 1213, 1221, n.4 (D.N.M. 2011); *Moody v. Oklahoma Dept. of Corrections*, 879 F. Supp. 2d 1275, 1292, n.102 (N.D. Okla. 2012).  To consider arguments raised for the first time in reply "would be 'manifestly unfair to [plaintiff] who, under our rules, has no opportunity for a written response'" and "it would also be unfair to the court itself, which, without the benefit of a response . . . to [a] late-blooming argument, would run the risk 'of an improvident or ill-advised opinion,' given our dependence as an Article III court on the adversarial process for sharpening the issues for decision."  *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994) (quoting *Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992)).

### C.     ADA Failure to Accommodate

SRMC argues that it is entitled to summary judgment on Holmes's claim for a failure to accommodate because Holmes did not request any accommodation, and SRMC granted all of Holmes's workplace requests, including permitting her to work a part-time schedule, primarily from home, with a reduced, part-time sales quota.

As a precondition to suit, employees have the burden to request accommodation unless the employer has foreclosed the interactive process through its policies or explicit actions. *Koessel v. Sublette County Sheriff's Dept.*, 717 F.3d 736, 744 (10th Cir. 2013). "It is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests." *Id.* at 745.

Holmes asserts that leave from work may be an accommodation, and she made her needs to accommodate her disability known to SRMC when she referred to seeking "disability" and requested information from which she could determine whether she would qualify for FMLA leave, but in that proximate time-frame, one SRMC employee instructed Holmes's direct supervisor to "Hold off on discussing FMLA with Carolyn!!!!" Holmes testified that she followed up several times with SRMC regarding FMLA and whether she would qualify to take such leave, but that SRMC did not timely respond to her inquiries. Indeed, when called to the meeting on July 14, 2011, she believed the topic of discussion was going to be FMLA leave, but she was discharged instead. SRMC terminated her immediately after a hospital visit and did so after confirming internally that Holmes had not yet tendered completed FMLA paperwork.

Medical leave requested by an employee may be a reasonable accommodation for a disability within the meaning of the ADA. *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002). Whether medical leave is a reasonable accommodation under

the ADA is a mixed question of law and fact. *Id.* While the Court views the evidence of a request for medical leave -- specifically as an accommodation under the ADA -- to be thin, it could be inferred from the evidence that Holmes made her needs for accommodation, including the potential of taking FMLA leave, known to SRMC, but SRMC foreclosed the interactive process through its conduct. Moreover, in her "chronologic list of performance" issues, Whelan expressly referenced the fact that Holmes had previously "voiced concerns about returning to full-time," from which it could be inferred that SRMC terminated Holmes so that it would not have to continue to accommodate Holmes by allowing her to work part-time. Accordingly, the Court will deny the request for summary judgment on Holmes's accommodation claim.[2]

### D.     FMLA Retaliation

SRMC asserts that, to the extent that Holmes has asserted a retaliation claim under the FMLA, summary judgment should be granted on such claim because Holmes has provided no evidence of retaliation and she testified as follows:

> Q.     Did any – did anybody ever retaliate against you because you sought the benefits of the FMLA?
>
> A.     Not to my knowledge....

---

[2]     SRMC also asserts that Holmes failed to exhaust her ADA accommodation claim. However, that argument was not fully developed in its initial motion, nor was it the subject of a separate proposition in its opening brief. (*See* Doc. 87). Rather, in a footnote, SRMC merely asserted that Holmes had not exhausted an accommodation claim based upon a failure to reduce her sales quotas. (*See* Doc. 87 at 37, fn. 10). Holmes has represented that she has no intention of presenting an accommodation claim based upon a failure to reduce her sales quotas. (*See* Doc. 116). SRMC did not argue for summary judgment based upon a failure to exhaust an accommodation claim based upon *interfering with medical leave* until SRMC filed its summary judgment reply brief. As noted above, the Court typically does not address issues raised for the first time in reply, as the other party has not had an opportunity to fully respond to those newly-raised issues. (*See* fn. 1 *supra*). Moreover, the exhaustion issues are the subject of a separate motion in limine filed by SRMC (Doc. 103), and the Court will address those issues in a separate order on that motion.

Q.    Were – were you ever mistreated in any way by anybody because you took these leaves of absences?

A.    No.

(Doc. 87 at 39, citing deposition testimony).  In her response brief, Holmes did not identify any evidence of retaliation and she did not attempt to explain her testimony.

The record does not include evidence from which a reasonable jury could find that Holmes was discharged in retaliation for exercising rights under the FMLA.  Summary judgment is granted to SRMC on any FMLA retaliation claim.

**E.    FMLA Interference**

SRMC also moves for summary judgment on Holmes's claim for FMLA interference. Under the FMLA, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA leave provisions]." 29 U.S.C. § 2615(a)(1).  Under the regulations promulgated by the Department of Labor, "[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act."  29 C.F.R. § 825.220(b).  The regulations impose a duty on an employer "to responsively answer questions from employees concerning their rights and responsibilities under the FMLA."  *Id.* § 825.300(c)(5); *see also id.* § 825.300(b) (requiring an employer to promptly provide information regarding the "employee's eligibility to take FMLA leave").

To establish an FMLA interference claim, a plaintiff must show that (1) she was entitled to FMLA leave, (2) some adverse action by SRMC interfered with her right to take FMLA leave, and (3) the adverse action was related to the exercise or attempted exercise of the plaintiff's FMLA rights.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006).  "[A] denial, interference, or restraint of FMLA rights is a violation regardless of the

employer's intent ... and the *McDonnell Douglas* burden-shifting analysis does *not* apply to interference claims." *Id.* (citations omitted) (emphasis in original).

SRMC contends that plaintiff was not entitled to FMLA leave, because she did not complete and provide paperwork with SRMC's third-party administrator. In support of this assertion, SRMC cites deposition testimony of Holmes in which she generally acknowledges that she understood completion of paperwork with the third-party administrator would be required to obtain FMLA leave. (*See* Doc. 87 at 43, citing Undisputed Material Fact Nos. 55-56). However, Holmes directly disputed that McKowen directed her to SRMC's computer system to complete and submit paperwork to the third-party administrator, as she stated that she and McKowen "did not get that far in the conversation ... because [McKowen] was supposed to be getting information for me... about whether or not I would have enough hours [to qualify for FMLA leave] because I had gone back to part-time and he simply didn't know." (Doc. 96-4 at 41-43). According to Holmes, she followed up with McKowen "many times" and "went by his office numerous times" and was awaiting the information. (*Id.*). She believed that FMLA was to be the topic of discussion when she was called to a meeting on July 14, 2011, but she was terminated at that time. As noted, just days before she was discharged from employment and, at a time when she was in the hospital, SMRC supervisors sought to confirm that she had not yet initiated her FMLA paperwork with the third-party administrator. She was promptly fired thereafter.

As Holmes notes in her response, SRMC does not challenge that Holmes was an eligible employee under the FMLA's time provisions, which require that an employee worked a minimum of 1,250 hours in the preceding twelve months to be eligible. (*See* Doc. 96 at 41, citing 29 U.S.C. §2611(2)(A)). Rather, SRMC asserts that Holmes was not entitled to FMLA

because she did not complete and submit the necessary medical paperwork to SRMC's third-party administrator. However, the applicable FMLA statutes and regulations make it unlawful for an employer to interfere with an *attempt* to exercise any right under the FMLA. 29 U.S.C. § 2615(a)(1); *Metzler*, 464 F.3d at 1180. Holmes has presented evidence that she was awaiting notice from SRMC of whether or not she was eligible for such leave so that she could determine her available disability leave options. The evidence summarized above presents an issue of fact as to whether SRMC interfered with Holmes's attempt to exercise rights under the FMLA before she was terminated.

SRMC also argues that Holmes has not presented any evidence that SRMC interfered with her right to take FMLA leave. However, the same evidence referenced above also presents an issue of fact as to this element. If the evidence cited by Holmes is believed, SRMC refused to respond to her request for eligibility information and discharged her before notifying her that she met eligibility requirements based upon her hours worked during the previous 12 months. In addition, shortly after her hospitalization, Holmes was called to the meeting at which she was notified of her termination. She believed that meeting was to be about FMLA. There is a genuine dispute of fact with respect to this element of her interference claim.

SRMC's final argument for summary judgment on the interference claim is that it terminated Holmes for failure to meet sales quotas. For the same reasons the Court has concluded that Holmes has presented evidence which, construed in her favor, would support that the stated reason was pretextual, the Court concludes there is an issue of fact as to this element of the FMLA interference claim. Internal SRMC documents directly relating to termination of Holmes expressly reference "disability" and FMLA leave, and it could be inferred from the July

11 communications between SRMC supervisors that SRMC wished to terminate Holmes before she could complete a FMLA claim.

## IV. Conclusion

SRMC's motion for summary judgment (Doc. 87) is **granted in part and denied in part** as set forth herein.

SO ORDERED this 24th day of October, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE